**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| UNITED STATES OF AMERICA,    ) | |
|         ) | |
|     Plaintiff,        ) | |
|         ) | |
| vs.        ) | Cr. No. 10-1122 RB |
|         ) | |
| ROBERT GARCIA,        ) | |
|         ) | |
|     Defendant.        ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW
AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

THIS MATTER came before the Court on Defendant Robert Garcia's Motion to Suppress Physical Evidence and Statements. (Doc. 21.) A hearing was held on June 30, 2010. Having fully considered the evidence and the arguments for and against, the Court hereby DENIES Defendant's motion.

**FINDINGS OF FACTS**

1. In early August 2009, Agent Hiram Latin of the Alamogordo Department of Public Safety Narcotics Enforcement Unit received information from a reliable confidential informant that he had observed Defendant Robert Garcia with a large quantity of methamphetamine, consistent with drug trafficking, at his residence in Alamogordo, New Mexico. (Gov't Ex. 1, p. 4.) The informant also gave Agent Latin a physical description of the residence and its location: it was located at the corner of Mesquite and Collins, it had brown or light brown trim, there was a boat parked on the north side, and although the residence did not have an address, there was a #32 on the west end of the trailer.

2. With this information, Agent Latin drove out to the residence to conduct surveillance, take

photographs, and verify the physical description and location of the residence given by the confidential informant. Agent Latin also obtained a photograph of Defendant, and the confidential informant confirmed this was the person he had observed at the mobile home.

3. Once he confirmed the physical description and location of the residence, as well as Defendant's identity, Agent Latin drafted a search warrant and swore out an affidavit. Although some time had elapsed since the informant initially observed the drugs, Agent Latin believed evidence of drug use and drug trafficking would still be found at the mobile home because, in his "experience and training, persons who use and deal in drugs normally maintain a supply of drugs in their residence along with other evidence of use and distribution." (Gov't Ex. 1, p. 5.) Indeed, the information he had received from the informant was less than seventy-two hours old at the time Agent Latin actually applied for the warrant, and therefore, there was a good chance that drugs were still present. Additionally, the search warrant requested permission to search for items related to drug use and drug trafficking that are less evanescent in nature—including paraphernalia, monies, papers, ledgers, documents, bank records, cell phones, firearms, surveillance equipment, lockboxes, safes, and photographs or movies depicting the use or sale of illicit drugs.

4. Based on the information provided by Agent Latin, a New Mexico State District Court Judge approved the search warrant on August 7, 2009.

5. The warrant indicated the place to be searched as "1220 Mescalero Street, City of Alamogordo, Otero County, New Mexico." The warrant also included an accurate and detailed physical description of the residence, indicating that it was "a single wide mobile home," that it was "white in color with brown trim," and that the residence had "the number 32 displayed on the west end of the mobile home." (Gov't Ex. 1, p. 3.) Additionally, the

warrant included a recent photograph of the residence that had been taken by Agent Latin.

6. Although the written description and the photograph accurately identified the residence, the mobile home was not located at 1220 Mescalero as stated in the warrant; rather, it was located at the other end of the block, on the corner of Collins and Mesquite.

7. The warrant also indicated that the mobile home was "the last residence on the right side of Mescalero Street when traveling west on Mescalero." (Gov't Ex. 1, p. 3.) This was also incorrect. At the hearing, Agent Latin indicated that this was a typographical error, and that the warrant should have stated that it was the last residence on the right when traveling west on "Mesquite." This would have been an accurate description of the home's location.

8. The mobile home had never been assigned an address by the city, and, except for the number 32, it did not have an address number displayed on the home, the fence, or anywhere else on the property. At one time, Defendant requested an address from the city, but was told that the lot would have to be surveyed before it could be assigned an address, and therefore, no address was ever obtained.

9. The address, "1220 Mescalero," actually pertained to a frame house at the other end of the block that was owned by Defendant's mother. Defendant received his mail at his mother's house and listed "1220 Mescalero" as his address on his drivers' license.

10. The Garcia family owns all of the lots on the block where Defendant's mobile home and his mother's house are located. In Alamogordo, it is not uncommon for there to be a house with an address at the front of the property, and then several mobile homes in back of the house that are labeled with numbers, for example, "1220 Mescalero, #2."

11. Agent Latin conducted additional surveillance of Defendant's mobile home following the approval of the warrant: he observed Defendant using the residence and considerable

      pedestrian traffic in and out of the house, indicating possible drug activity. Sergeant Hal Alton, who participated in the search, also knew the mobile home belonged to Defendant, as he had responded to a loud noise complaint at the residence on May 13, 2008 and spoke with Defendant, who indicated that he lived there. Additionally, Agent Mirabal, who participated in the search, drove out and confirmed the location of the residence prior to the search. Consequently, while the search warrant may have stated an inaccurate address, the officers had confirmed the location and description of the house several times before the search, and there was not any confusion amongst the officers about which residence belonged to Defendant and which residence was identified in the search warrant.

12. On August 16, 2009, several officers from the Alamogordo Department of Public Safety Narcotics Enforcement Unit, along with several members of the Alamogordo Department of Public Safety Emergency Response Team, executed the search warrant for Defendant's residence at approximately 6:07 a.m. The Emergency Response Team was responsible for the initial entry and securing of the residence, and the Narcotics Enforcement Unit was responsible for conducting the search for drugs and other evidence once the house was secured.

13. Before executing the search warrant, Agent Latin had applied a "warrant matrix" to the facts of the case to assess the likely risk to the officers of searching this particular residence. Officers utilize a warrant matrix by plugging potential threats into the matrix—such as the suspect's past criminal history or the likelihood of guns being located at the place to be searched—and the warrant is assigned a point score. In the case at hand, Agent Latin determined that the risk of the search was elevated and requested assistance from the Emergency Response Team.

14. As the warrant did not include a "no knock" provision, before breaching the residence, the officers knocked on the front door of the mobile home three times, each time announcing loudly, "Police Department, Search Warrant!" While they were knocking, the officers could hear footsteps and the movement of people inside the mobile home; however, it did not sound like they were moving toward the door. After approximately eighteen seconds of knocking, the officers brought in a battering ram, which consisted of a pipe filled with sand that had handles attached to the sides and was swung by the officers.

15. The officers were required to hit the door several times with the ram in order to gain entry into the home. The front door to the residence had been barricaded from within with a large, home-stereo speaker, approximately two to three feet tall, which impeded the officers' entry. Normally, a door's latch will break after only one hit with the battering ram, and the door will swing open on its hinges, with minimal damage, and without coming off the door frame. In the case at hand, however, because the door was barricaded, the officers had to hit it several times with the battering ram, knocking it completely off its hinges.

16. The officers also broke a bathroom window during the execution of the warrant to prevent Defendant from disposing of any drugs. The kitchen and bathroom are two areas where people commonly attempt to dispose of drugs during the execution of a search warrant; therefore, police will often place officers outside the bathroom or kitchen window prior to a search, and then break the window at the initiation of the search, so that they can control the area during the execution of the warrant and prevent the destruction of evidence.

17. Upon entering the home, the officers observed Defendant crouching near the kitchen sink, and a second individual, Mr. Herbert Seamans, running down the hallway toward the back of the residence. The water in the kitchen sink was running, and several bags of

methamphetamine were found in the garbage disposal.

18. Defendant and Mr. Seamans were detained, placed in handcuffs, and escorted outside while the officers finished securing the house.

19. After the officers secured the residence, Agent Latin approached Defendant with a copy of the warrant; he went through the warrant with Defendant, told him the officers were going to search the residence, and asked Defendant if he had any questions about the warrant. This occurred approximately fifteen minutes after the officers arrived at the residence.

20. During the search, the officers found sixteen bags of methamphetamine (approximately 54 grams of methamphetamine in total), marijuana, pills, around $30,000 in cash, drug paraphernalia, security cameras, ledgers, and other drug-related items inside the home.

21. Except for the bathroom window and the living room door, nothing inside the home was damaged or broken during the search. The officers indicated that it is their policy to leave the house in the same condition it is found and to not damage a house or its contents during a search. If something is broken by accident, the officers have a procedure in place to deal with that: the item is photographed, and it is reported to a supervisor. No items were reported broken or damaged. Furthermore, the photos taken by the officers prior to the search indicated that the mobile home was messy and generally in a state of disarray; therefore, the Court finds the disorder and mess were not the result of the police search.

22. While the officers were conducting the search, Agent Mike Mirabal, Supervisory Agent of the Alamogordo Department of Public Safety Narcotics Enforcement Unit, sat outside with Defendant. Agent Mirabal read Defendant his *Miranda* rights from a printed card he carried in his wallet, stopping after he read each right to ask Defendant if he understood. Defendant indicated that he understood his rights.

23. After the search, Agent Latin interviewed Defendant. This interview was recorded. Before questioning Defendant, Agent Latin attempted to give him his *Miranda* rights again, but Defendant interrupted and indicated that Agent Mirabal had already read him is rights.

24. During this interview, Defendant explained that his correct address was 1208 Collins, but that he used 1220 Mescalero Street as his address because of permit issues for his mobile home with the City of Alamogordo.

25. Agent Latin then asked Defendant, "What do you want to tell me, man?" Defendant responded, "Man, I don't know man. If I say anything, ya' know, I'm screwing myself when it comes time for court."

26. Agent Latin persisted, asking whether he sold drugs to make ends meet because he didn't have a job. Defendant responded, "Well, I don't have a job right now, man, it's been tough on me, man. I just can't find any work right now, man. And I've been a carpenter all my life. And, I mean, I'm a good carpenter. I just can't find any work right now."

27. Agent Latin continued, "Why are you selling methamphetamine?" Defendant responded, "I have to stand mute to any kind of questioning without a lawyer, you know. I'm not trying to be an ass, but you know what I'm saying? Rights. You know, to have my lawyer present." The government acknowledges that this last statement represented "an unequivocal assertion of Defendant's Fifth Amendment right to counsel," but argues that the first statement before Defendant invoked his rights is admissible. (Doc. 23, p. 8.)

## CONCLUSIONS OF LAW

### *Information in Search Warrant Was Not Stale*

1. An issuing judge's probable cause determination with regard to a warrant is given substantial deference. *See Illinois v. Gates*, 462 U.S. 213, 236 (1983); *United States v. Cantu*, 405 F.3d

1173, 1176–77 (10th Cir. 2005); *United States v. Tuter*, 240 F.3d 1292, 1295 (10th Cir. 2001). Provided the judge had a "substantial basis" for his decision, it will be upheld. *Gates*, 462 U.S. at 238–39. In making this determination, the Court must look at the totality of the circumstances. *United States v. Tisdale*, 248 F.3d 964, 970 (10th Cir. 2001).

2. Probable cause exists where the affidavit "sets forth facts that would lead a prudent person to believe there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Untied States v. Basham*, 268 F.3d 1199, 1203 (10th Cir. 2001). Agent Latin's affidavit, indicating that a reliable confidential informant had observed distributable amounts of methamphetamine in Defendant's house within seventy-two hours of the application for the warrant, clearly supported a finding of probable cause at the time the warrant was issued. Considering the nature of the criminal activity and the nature of the property to be seized, this information was not stale at the time of the issuance of the warrant. *United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990). The quantity of drugs indicated a continuing criminal enterprise and that the drugs and other evidence of drug use and trafficking would not be disposed of in this short time period.

3. There existed a substantial factual basis from which the issuing judge could have reasonably concluded that probable cause existed to believe the items listed in the search warrant would be found at the residence.

*Warrant Was Not Stale When Executed*

4. The search warrant was issued on August 7, 2009 and executed nine days later on August 16, 2009. Federal Rule of Criminal Procedure 41(e)(2)(A)(i)(ii) and New Mexico Rule of Criminal Procedure 5-211 require officers to execute a search warrant within ten days of its issuance. The search clearly did not violate these statutory requirements.

5.  The Court's analysis does not end here, however, as it must also consider whether the execution of the search warrant violated constitutional requirements. *See United States v. Sims*, 428 F.3d 945, 955 (10th Cir. 2005) ("The Fourth Amendment does not specify that search warrants contain expiration dates."). Under the Fourth Amendment, the relevant inquiry is whether probable cause existed to believe the items listed in the search warrant would be present in the house at the time if the search. *See United States v. Burgess*, 576 F.3d 1078, 1096–97 (10th Cir. 2009). Following the issuance of the warrant, Agent Latin conducted additional surveillance of the residence and observed significant pedestrian traffic in and out of the home, indicating possible drug activity. Furthermore, people who use or sell drugs generally keep a ready stash in their house, in addition to other types of evidence that cannot be easily disposed of, and these items were likely to be found in the house, even after nine days. Considering the totality of the circumstances—the nature of the criminal activity, the nature of the property to be seized, and Agent Latin's observations—the Court concludes that the warrant was not stale at the time of its execution, as there was a fair probability that the items listed in the warrant would be found in the home. *Snow*, 919 F.2d at 1460. Accordingly, the Court concludes that there was no Fourth Amendment violation.

    ***Warrant Described Residence with Sufficient Particularity***

6.  In order to comply with the Fourth Amendment, a "warrant must describe the place to be searched with sufficient particularity so that the executing officer can locate and identify it with reasonable effort." *United States v. Dorrough*, 927 F.2d 498, 500 (10th Cir. 1991). "The Supreme Court has stated that practical accuracy rather than technical precision controls the determination of whether a search warrant adequately describes the premises to be searched." *Id*. (citing *United States v. Ventresca*, 380 U.S. 102, 108 (1965)). While a

mistake in address might invalidate a warrant in certain circumstances, in the case at hand, the presence of several mitigating factors substantially lessened the risk of a mistaken search of the wrong premises; therefore, the Court concludes that the search did not violate Defendant's Fourth Amendment rights. *United States v. Lora-Solano*, 330 F.3d 1288, 1293 (10th Cir. 2003) ("A technically wrong address does not invalidate a warrant if it otherwise describes the premises with sufficient particularity so that the police can ascertain and identify the place to be searched.").

7. In the case at hand, the warrant provided a detailed description of the mobile home and included a photograph, making a mistaken search of the wrong premises unlikely. Additionally, a few days before the search, Agent Latin conducted visual surveillance of the mobile home and observed Defendant enter the residence; his presence during the search and familiarity with the residence "provided additional reliability that the correct premises would be searched." *United States v. Sturmoski*, 971 F.2d 452, 458 (10th Cir. 1992). Moreover, Sergeant Alton's and Agent Mirabal's familiarity with the residence also helped cure any ambiguity: while an officer's knowledge cannot be "the sole source of information regarding the place to be searched," an officer's knowledge may cure a technically inaccurate warrant, provided there are other factors that reliably indicate the correct premises to be searched. *United States v. Brakeman*, 475 F.3d 1206, 1211–12 (10th Cir. 2007).

8. It is also significant that Defendant indicated he used 1220 Mescalero as his address due to permit problems for his mobile home with the City of Alamogordo, and that this was also the address listed on his driver's license. By these acts, Defendant held out to the public that 1220 Mescalero was his address, contributing to any ambiguity, and he should therefore be held at least partially responsible for the resulting mistake in the warrant.

9. Ultimately, the Court concludes there were sufficient indicators of reliability to ensure the correct premises would be searched and to satisfy the Fourth Amendment's particularity requirement, and there was no prejudice to Defendant, as the correct residence was searched.

***Officers Did Not Violate the Constitutional Requirements of "Knock and Announce"***

10. The reasonableness of a search conducted by state officers acting under a state-issued search warrant must be determined under state law, provided state law does not conflict with the federal constitution. *See Ker v. State of California*, 374 U.S. 23, 37 (1963). Thus, the federal "knock and announce" statute, 18 U.S.C. § 3109, is not applicable in the case at hand. Nonetheless, New Mexico courts have determined that the "New Mexico Constitution requires law enforcement personnel to knock and announce their authority when executing a warrant." *State v. Attaway*, 870 P.2d 103, 113 (N.M. 1994). In determining whether officers violated the "knock and announce" rule, New Mexico courts apply the same "totality of the circumstances" test as the Tenth Circuit to determine whether the search was reasonable under the circumstances. *See New Mexico v. Johnson*, 146 P.3d 298, 301–03 (N.M. 2006). Consequently, as New Mexico law does not provide any additional constraints on officers, the issue, here, is whether exclusion of the evidence is warranted under the Fourth Amendment. *See Wilson v. Arkansas*, 514 U.S. 927, 929 (1995) (finding "knock and announce" requirement "forms a part of the reasonableness inquiry under the Fourth Amendment"); *United States v. Mitchell*, 783 F.2d 971, 973–74 (10th Cir. 1986).

11. "[T]he reference point for the reasonableness determination is the amount of time between when the officers begin to announce their presence and when the officers hit the door with a battering ram or other implement which could destroy the door and allow them entry." *United States v. McCloud*, 127 F.3d 1284, 1289 n. 2 (10th Cir. 1997). There is not "a clear-

cut standard by which to determine the amount of time officers must wait after knocking and announcing before forcibly entering a [dwelling]." *United States v. Jenkins*, 175 F.3d 1208, 1213 (10th Cir. 1999). In *United States v. Knapp*, 1 F.3d 1026, 1031 (10th Cir. 1993), "[i]t was plausible for the officers to conclude that they were affirmatively refused entry after a ten to twelve second interval without a verbal or physical response." Based on the small size of the mobile home and the lack of response from inside the home after the officers' repeated knocking, the Court concludes that eighteen seconds was sufficient time for the police to infer that Defendant had refused to answer the door.

12. Moreover, where there are exigent circumstances, officers may forego the "knock and announce" requirement altogether, or enter the home more quickly than would be reasonable under normal circumstances. *Ker*, 374 U.S. at 40–41; *United States v. Dahlman*, 13 F.3d 1391 (10th Cir. 1993). In the case at hand, the officers reasonably believed that Defendant was in possession of narcotics which could be quickly and easily disposed of. Additionally, they heard movement inside the home away from the door. Accordingly, the officers were permitted to enter the home more quickly, and the breaking of the door and the bathroom window to prevent destruction of the drugs was reasonable under the circumstances and not a violation of the Fourth Amendment. Indeed, when the officers entered the home, Defendant was in the process of disposing of evidence in the kitchen sink.

### *Officers Did Not Violate Defendant's Constitutional Rights by Failing to Provide a Copy of the Search Warrant at Initiation of the Search*

13. Under Federal Rule of Criminal Procedure 41(f), "[t]he officer executing the warrant must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken." Under New Mexico Rule of Criminal

        Procedure 5-211, officers executing a search warrant shall provide a copy of the affidavit from the search warrant, the search warrant, and a copy of the inventory of the property taken "promptly after execution of the warrant."

14. As previously noted, state law generally governs the execution of a state-issued search warrant executed by state officers, provided the execution of the warrant minimally meets federal constitutional requirements. *See Ker*, 374 U.S. at 37; *United States v. Mitchell*, 783 F.2d 971, 973–74 (10th Cir. 1986).

15. "Violations of Rule 41([f]) are essentially ministerial in nature and a motion to suppress should be granted only when the defendant demonstrates legal prejudice or that non-compliance with the rule was intentional or in bad faith." *United States v. Marx*, 635 F.2d 436, 441 (5th Cir. 1981). In other words, for suppression to be warranted, the failure to provide Defendant with a copy of the search warrant must implicate those rights protected by the Fourth Amendment (i.e., one's right to privacy and to be free from unreasonable government intrusions into the home). *See Groh v. Ramirez*, 540 U.S. 551, 561 n. 5 (2004). New Mexico courts have also adopted this approach. *State v. Mallow*, 34 P.3d 611, 614 (N.M. Ct. App. 2001) ("Because Rule 41 . . . is similar to Rule 5-211, we find the federal authorities persuasive.").

16. At most, the failure of the officers to immediately provide Defendant a copy of the warrant at the outset of the search represented a technical violation of the procedural rules for execution of a warrant, and therefore, it did not result in a violation of his Fourth Amendment right to be free from unreasonable searches and seizures. Waiting fifteen minutes to provide Defendant with a copy of the warrant while the officers worked to secure the house was clearly reasonable. Additionally, the Court does not believe the officers

violated New Mexico Rule of Criminal Procedure 5-211, which only requires officers to provide a copy of the warrant "promptly after execution of the warrant." To not allow officers the opportunity to first secure the residence could endanger the safety of suspects, officers, and the public.

### *Defendant's Initial Statements Are Admissible*

17. Since there were no Fourth Amendment violations with regard to the initial search and seizure, Defendant's statements cannot be suppressed as fruit of the poisonous tree; therefore, if the Court is to suppress any of the statements made during the custodial interrogation following the search of his residence, Defendant must demonstrate a Fifth Amendment violation.

18. In order for a defendant's statements made during a custodial interrogation to be admissible at trial, the government must show that Defendant was properly advised of his *Miranda* rights, that he understood those rights, and that he knowingly and voluntarily waived those rights. *Berghuis v. Thompkins*, No. 08-1470, 2010 WL 2160784, at *8–11 (U.S. June 1, 2010); *Colorado v. Spring*, 479 U.S. 564, 573–75 (1987); *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). If these requirements are met, and a defendant waives his right to remain silent, he must then unambiguously invoke his right to consult with counsel or to remain silent to cut off further police questioning. *Thompkins*, 2010 WL 2160784, at *9.

19. Agent Mirabal initially gave Defendant his *Miranda* rights. Defendant stated that he understood his rights and waived them by talking with the officers. *Id.* at *11 ("Where the prosecution shows that Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to

remain silent.").

20. Agent Latin then interviewed Defendant. Defendant again waived his rights by conversing with the officers. Agent Latin asked, "What do you want to tell me, man?", Defendant replied, "Man, I don't know man. If I say anything, ya' know, I'm screwing myself when it comes time for court." Defendant's statement was ambiguous and equivocal; therefore, the officers were not required to cut off questioning. *See id.* at *8–9; *Davis v. United States*, 512 U.S. 452 (1994) ("Invocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' " (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991))).

21. A short time later, however, when Agent Latin asked, "Why are you selling methamphetamine?", Defendant responded, "I have to stand mute to any kind of questioning without a lawyer, you know. I'm not trying to be an ass, but you know what I'm saying? Rights. You know, to have my lawyer present." This was a clear and unambiguous invocation of Defendant's *Miranda* rights. The government acknowledges this. (Doc. 23, p. 8.) Accordingly, any statements made after this point must be suppressed.

## **ORDER**

THIS MATTER came before the Court on Defendant's Motion to Suppress Physical Evidence and Statements. (Doc. 21.) The Court concludes as follows: (1) the information in the affidavit was not stale; (2) the search warrant was not stale; (3) the warrant described the place to be searched with sufficient particularity; (4) the officers did not violate the constitutional requirements of the "knock and announce" rule; (5) the officers did not violate Defendant's Fourth Amendment rights by failing to provide him with a copy of the search warrant at the initiation of the search; (6) Defendant's initial statements to the officers are admissible; however, (7)

Defendant's subsequent statements, after he unambiguously invoked his *Miranda* rights, are excluded.

**WHEREFORE,**

    **IT IS HEREBY ORDERED** that Defendant's Motion to Suppress (Doc. ) is **DENIED**.

_____
**ROBERT BRACK**
**U.S. DISTRICT COURT JUDGE**